Good morning, Your Honors. May it please the Court? I'm Janice Mazur, appearing for the appellant, Bruce Bickoff. Lots of extensive briefing in this case, so I'm not going to reiterate all the facts and theories. I would like to focus on a couple of points that I think are key, and the first would be Wells Fargo's loss of the construction loan agreement, which I do think supports an inference that the agreement was unfavorable. Why does it support an inference? Your client apparently lost it, too. My client never had it. Or at least the people that he dealt with, the escrow agents, etc. Right, right. He did make efforts to get it. Yeah, but why does it support an inference? Is there any evidence that they lost it after they knew a lawsuit had been filed about it? Well, not that they knew that a lawsuit had been filed, but I'm glad you brought that up. Well, I think what Wells Fargo has characterized their duty to preserve is that there must be a clear threat of litigation, and that's not Who to whom do they have a duty to preserve? I'm trying to figure out where See, normally a duty to preserve something arises when somebody says, you have an important document, and I hold on to it because we're going to fight about it, or I have a question about it. Sure. From whence does their duty to preserve arise? Well, that's a good question. I would say at the very latest Thank you. That's a good answer. Right. At the very latest, I think they were on that reasonably could lead to litigation in April of 2010. At that point, this was after Assuming that's right. Right. Is there any evidence that this was There's no evidence of destruction here. They just can't find it. Well, so when was it lost? Was it lost before the duty arose or after the duty arose? Well, that's another good question. What Wells Fargo says I'm doing really well with you this morning. You're doing great. Yeah. What Wells Fargo says is that it was lost somewhere between 2007 and 2011. Well, that's a pretty broad spectrum, and it really creates an impossible burden for my client because he never had possession of it. He has no way of knowing when they lost it. But so I think that that brings it. Is it their fault that he never had possession of it? That's my problem. Well, yeah, I think I think it is. I mean, he signed all the documents, as I remember, with the title company, right? And there's no dispute that the agreement was there. The title company didn't give him copies of the agreement. He asked for them that day. So why is it Wells Fargo's fault that the title company didn't give him? Because then he went back to Mr. Ostov, who was the the agent who was, you know, promoted this and worked with him through all the course of it and asked for the documents. He went to a second place, too. He went to the title company. They said you had to go to a different office, which I think was the Wells Fargo office. Did he immediately approach Wells Fargo and say, Well, wait a minute. This company really messed up. I need to have a copy of its pretty big loan. Well, you know, I think he made a significant... Well, no, tell me when he made that significant effort. He did it immediately after it was immediately after it was signed. Then he did it again the next day. With the title company? With the title company and then with another office, and I think it was a Wells Fargo office. They told him to go to the different office. Yeah, see, I thought the record didn't, and maybe it's not important, but I thought the record didn't disclose that Wells Fargo was actually asked for this document until the dispute began. Well, and then in 2010, certainly, he did ask for it again. So is there any evidence that he asked Wells Fargo for the document before 2000? I believe he asked Mr. Ostrom, and I'll try to look that up when counsel's speaking. All right, so there's a missing piece of evidence in this case, and it's a key piece of evidence, and the court basically let in the exemplar. What evidence is there in the record that shows that permanent financing was guaranteed? Well, the exemplar doesn't show it. That's not usually how these construction loans work, so what evidence is in the record I can look to? Right, well, first we would argue that the exemplar, this tribal issue, is a fact as to whether that exemplar was consistent with the document he signed. I know the Wells Fargo person most manageable, I mean most knowledgeable, said that she had never seen the document that he signed. I'm trying to refocus you away from that onto the affirmative evidence in the record that shows that permanent financing was guaranteed. You say permanent financing was promised. Tell me what evidence, tell Judge Wendt, what evidence in the record shows that. Okay, well, I think that the clearest way to look at it is the representations that were made going to the causes of action. Well, except I've looked at what he said. Your client says the document referenced permanent financing. The exemplar references permanent financing, too, and then he says I wouldn't have signed it had I not thought it gave me... That's not really testimony that the document has a promised and permanent financing, so tell me where else in the record... No, just let me finish. Tell me where else in the record there's evidence that created a triable issue of fact on this? Well, this this loan was marketed specifically as one loan with two closings, and he worked very closely with the expert. But everybody agrees, it's not disputed in this case, that this loan is designed to let you get permanent financing at the end of it. The question is whether it's promised, and so tell me what evidence in the record is there is that Wells Fargo promised your client permanent financing. Mr. Ostrom told Mr. Bickoff when the conditional letter came in, you are approved for permanent financing. It was. Everybody agrees that the approval had been made. The question is whether or not he was promised that he would receive permanent financing. Right. Well, I think that he justifiably relied on the representations that were made by the representatives of the bank saying that this was going to be permanent financing. This is the way they marketed to him. They told him that it's going to roll over. In fact, there's an email in there. Let me see if I can find the page for you. There's an email from Miss Hanson, ER 61, that says the construction loan is going to roll into permanent financing, and that was back in May 2007, right at the very beginning. So... Can I ask a different question? The district judge, Judge Benitez, said you haven't shown any damages, and you never proffered any evidence that, in effect, had you received the permanent loan, you would have been able to pay it off. What do we do with that? I think the judge was was mistaken on that, Your Honor. What was your There's lots of evidence that there was equity in the property over and above the amount that the foreclosure... Well, but that's not the damage question. The damage question is would your client have still been foreclosed had he received a permanent loan, and is there any evidence that he could have paid off the permanent loan, that he had the ability to... I mean, if there was equity in the property, after all, you could go to anybody and borrow against it. Right. But no evidence of that either. Right. Well, I think what we have to view of this, and that is what was going on during this time period. He got the approval for the loan in 2007, spending a lot of money, you know... And the market crashed, and the property... Right, and the market crashed, and suddenly, suddenly we've got this, you know, enormous, you know, expenditure... So, it leads to the question. Did your client... Had your client gotten a permanent loan in the inflated amount, because the construction loan, obviously, was not what the property was worth. Right. Would he have been better off? Well, sure, I think. I mean, there's nothing in the record to suggest that he... But there's nothing in the record at all. That's my problem. So, what we have here is a construction loan made at the time when the market's good. The market crashes, and your client doesn't get a permanent loan when the market crashes. The permanent loan would be in the amount of the construction loan, obviously. Right, right. And much higher than what the property is worth. So, the question is, how was your client hurt by not getting the permanent loan? Well, for one thing, he was unable to sell... It has equity later, but... Right, right, but he was unable to sell the property once they put a notice of default on him. But if he would have sold the property subject to a permanent loan, wouldn't he? And the property was worth less than the loan amount at the time... No, the property was worth more than the loan amount. At the time that they failed to make... At the time that your client should have gotten the permanent loan, where's that in the record? There's... Well, there's... In other words, your argument is, at some point in time, he should have gotten a permanent loan. Right, right. So, what's the argument in the record of the property value at that point in time? Not today. Right. Well, he had two offers at the time, you know, close thereafter for $4.4 million and $4.9 million, which was well above the amount that they did the foreclosure for. So, the fact that there was two offers for that amount of money would indicate that, you know, it wasn't... Not when the foreclosure was done. At the time the loan was supposed to be made. The foreclosure didn't occur until two years later. Well, the estimate... And the market went back up. So, the question is, at the time the loan was made, if the property was worth less than the loan amount, what good would the permanent loan have done your client? Well, I don't think the property was less, was worth less than the loan amount. Is there an indication in the record, an ER site that you can point us to that would tell us the answer? I think that there is, Your Honor, and I will try to find that for you. I know there was lots of evidence of estimates. There was an appraisal... At the time of foreclosure. Yeah, but I'm not sure exactly. I don't know if I have an exact date of when the foreclosure was, but there was certainly estimates. I know Mr. Ostrom had valued the property, thought it would be worth about $8 million. That was early on. We're just looking for an ER site and your time is running short. Do you want to save the time? Yes, I will. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Robert Little on behalf of Wells Fargo. What drives the vast majority of Bickoff's appeal is the contention that he was entitled to an adverse inference that guaranteed him permanent loan financing. This permanent loan financing guarantee existed regardless of how much money he had in the bank, regardless of the appraisal of the property. Well, there was a commitment letter that seemed to indicate that if he'd managed to build his house within 12 months and he sought permanent financing, he would have gotten it then, wouldn't he? That is correct, Your Honor. So that wouldn't have mattered. What his financial situation was at the end of the 12 months, it would have only... he would have gotten the loan. That is outside of the 12 months, no, because too many things can happen. Income can go up and down. Bank accounts can go up and down. There can be adverse impact on a person's income, their assets, their ability to repay. Did anybody say any of this to Mr. Ostrom or did they write him emails? For instance, the one that's a 2ER61. There are two loans for construction loan. One for the construction phase and one when the loan rolls to permanent financing. And for each phase, there are separate set of disclosures. The rolls to permanent financing suggest... doesn't suggest a change in circumstance, does it? Within 12 months, after 12 months, Your Honor, the borrower must re-qualify for that loan. Tell me, that's in the exemplar? Where is that? Where do we find that the borrower must re-qualify? Bottom left-hand corner of SCR149. The exemplar? No, SCR149, Your Honor, is the plain language of the marketing materials. In the exemplar, there is no reference to permanent loan financing. So the marketing materials which Mr. Bickoff got said you got a year? 12 months, Your Honor, and... What evidence is there that he got those marketing materials? He claims that he did not get those marketing materials. You had marketing materials that said that, but there's no evidence that he saw them. That it, Your Honor, he denies that he saw them. That is correct. So tell me what evidence there is that he knew when he financing, the question is whether that promise in effect expired after a year? After 12 months, yes, Your Honor. That's a year? I agree, Your Honor, yes. Okay, so tell me, tell me what evidence there was that that was communicated to him. He says Mr. Ostrom said, don't worry, this rolls over into permanent financing, and truth is, it does, if it happens within a year. So tell me what his misunderstanding if there was one seems to be that he had more than a year. What's the evidence of what he knew about this one-year limit? The note, the deed of trust, the CLA with the integration clause, or the construction loan agreement, I should say, with the integration clause. Well, the note is due in a year, right? The construction loan, Your Honor, is due in 12 months. Okay. I'm sorry. I'll use 12 months. You're prepared to say 12 months. It's all right, and I misspoke, Your Honor. The construction loan was due after two years, originated in October of 2007. Well, see, that's part of my problem. The construction loan is due in two years, but your promise to roll into permanent financing is in a year, and Mr. Ostrom is alleged to have said, we're at summary judgment, don't worry, you're guaranteed permanent financing. It'll roll over. So the question is, what evidence is there that this guy knew that it only rolled over within a year? The note is dated after the year. Is there anything else that he saw, that we know that he saw or signed, that says he only has a year? The program disclosure that he signed at the time the loan originated specifically said 12 months. Now, tell me what the disclosure, Your Honor, may I step to the record? Yeah, it's in the record? Yes, Your Honor. If you don't have the reference right now, that's fine. I can find it. And the record is that he signed the program disclosure, which said you only have, you're promised this within a year, but not after that. His signature is on the program disclosure, and there is a provision in the program disclosure which says that the credit approval documents are good for 12 months. The same is true of the loan commitment letter, which also names various conditions that needed to be satisfied in order for him to qualify for permanent loan finance. And I think that the most important piece of evidence, or one piece of evidence, that there was no such unconditional loan guarantee or permanent loan financing guarantee, Your Honor, is at SCR 175 to 176. And that is the letter of Jamie Stewart, his own attorney, and his wife, ex-wife, who specifically in that letter indicates that she is aware that he is not guaranteed permanent loan financing unless he has a significant amount of funds in the bank. So here we have his own attorney who said she had met with Mr. Ostrom several times. He disagrees in his declaration in opposition to summary judgment. But we're at summary judgment. I understand, you have a powerful case. The question is, well, do you have enough of a case? They have enough of a case to get to a jury. And so I'm looking at the program disclosure. It's at an SCR, it's WF-00058. So tell me where it says... SCR, Your Honor. I'm looking at Wells Fargo. It's marked, maybe it's 0099, I can't tell. But I've got it in front of me. Tell me where it says the promise only lasts for a year. Your Honor, may we please get on the same page, just the bottom right-hand corner, does it... ER-99. I'm sorry. Not your fault, but my table of contents thing is over the ER number, so I can't read it. Thank you, Your Honor. And on ER-99, at sentence five, it specifically says the terms of your permanent loan shall float until you lock in an interest rate and points. And at paragraph eight... That doesn't talk about a year. It does not talk about the 12 months. You're correct, Your Honor, but it specifically says that the term shall float. In other words, that there is... That just may be. We'll give you a loan, but we can't promise the terms. Tell me where, I mean, I'm looking in this document and I don't see the words either 12 months or one year in them. So tell me where they are. In the program disclosure, there's this, the terms shall float in the... I'm asking a very specific question. Okay. There's something in here that says our commitment to give you a permanent loan lasts only one year. That isn't in this specific document. What other specific document in the record is it in? In the loan commitment letter, there is a specific reference to the credit documents being good for 12 months. Tell me the ER reference. I'm finding it, Your Honor. I'm looking at frequently asked questions. I'm looking, for example, Your Honor, at ER 176 to 177. Okay. In ER 176 to 177, at the bottom, there are several enumerated conditions. There's 10 of them, and 10 has four subparts. Okay. Now, this is not a document he signed. That is correct, Your Honor. And what's the... he denies seeing it? No, Your Honor. He actually, his third cause of action, he brought a claim for breach of this agreement, claiming that this was a contract and Wells Fargo had breached it. On appeal, he takes a completely different tact, and he says that this is not a binding contract. But the evidence, tell me what evidence, again, maybe we crossed each other in our question. Tell me what evidence there is that he, that he's, does he admit seeing this document? I know, yeah, I know he makes inconsistent claims based on it. Tell me what evidence there is that he saw it? Oh, Your Honor, well, he relied on it because he sued on it. Well, his lawyers may have seen it. Tell me what evidence is, there is in this record that he saw it. Not signed, right? No, Mark Ostrom signed it in May of 07. He sued on it in 2010. No deposition questioning or declaration that references it specifically, is that what you're saying? I believe that it's a declaration in opposition to summary judgment. In order to provide this site, Your Honor, I would need to submit a letter. Right, that's what we're struggling with. We're asking for help with going through the record, but we've taken you over your time. I don't know if you have any questions. Judge Eaton, do you have any questions? Thank you very much. Thank you very much, Your Honors. I'll be very brief. In response to the court's questions about the damages, I'm looking at the reply brief on page 14 that says that there was testimony that in 2010, the property was appraised for, I think, $7 million. The default was in 2009. Pardon me? When was the default on the construction loan? 2010. 2009. 2007, it's a 2007 transaction with a two-year loan. But it was extended. The construction loan was extended for a year? Right. Well, it was extended to, I believe, February or March of 2010. Okay. And April was when the default was taken, the original notice of default. And so, you know what? I'm on my own. I said reply brief. I don't think it is page 14, but I did see it. So there is evidence that in 2010, the property was appraised at far in excess of what the amount of the loan was. Oh, here it is. Sorry. Page 24 of the reply brief. As far as the commitment letter with the 12-month statement, I don't recall that there was any evidence either way that Mr. Bickoff saw that. That's in the record. I know that it's argued that he relied on it, and I could be mistaken on that. But if he was arguing he relied on it, well, his lawyers are saying that it was a breach. But, you know, I don't know. What does his declaration say? I don't recall whether it specifically said he saw that. Obviously, he signed a lot of documents. That one wasn't signed, but one would suppose that it was within the documents signed at the title company, but I can't guarantee that. I do think that the 12-month statement is certainly ambiguous. What the document says is that the credit approval is good for 12 months from the construction closing. It doesn't say from the construction loan closing. So that certainly could be interpreted to mean, you know, after the construction is done, then you have 12 months after that. And I think that it was entirely unclear what that meant, and I think there's testimony that Mr. Bickoff believed that some of those conditions there were the conditions to get the construction loan, and that they wouldn't have funded it at all if those conditions hadn't been met. It was not clear to him that these were conditions that were supposed to be met after the construction was complete. You're well over time, so unless Judge Hurwitz has a specific question, Judge Eaton? All right. Thank you, Your Honor. Thank you very much for your arguments, both sides. I'll submit the matter for decision.
judges: Nguyen, Hurwitz, Eaton